IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 5, 2015

## STATE OF TENNESSEE v. STANLEY BLUE

**Appeal from the Criminal Court for Shelby County
No. 0402312        James C. Beasley, Jr., Judge**

---

### No. W2014-01728-CCA-R3-CD   -   Filed June 17, 2015

---

A Shelby County jury convicted the Defendant, Stanley Blue, of facilitation of first degree premeditated murder, attempted second degree murder, and reckless endangerment. Following a grant of post conviction relief and a remand for resentencing, the trial court sentenced the Defendant to an effective term of forty-six years as a Range III, persistent offender. The Defendant challenged the length of his sentence on appeal, and this Court reversed the Defendant's sentences for attempted second degree murder and reckless endangerment. We remanded the case for a new sentencing hearing regarding these two convictions and affirmed all other judgments of the trial court. *State v. Stanley Blue*, No. W2013-00437-CCA-R3-CD, 2014 WL 1464177, at *9 (Tenn. Crim. App., at Jackson, April 14, 2014). On remand, the trial court conducted a sentencing hearing and imposed a total effective sentence of forty-four years. On appeal, the Defendant asserts that the trial court erred when it imposed consecutive sentences. After a thorough review of the record and applicable law, we affirm the trial court's judgments.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROGER A. PAGE, JJ., joined.

Patrick E. Stegall, Memphis, Tennessee, for the appellant, Stanley Blue.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Reginald Henderson, Assistant District Attorney General for the appellee, State of Tennessee.

# OPINION
## I. Trial

This case arises from the shooting of two victims, Mareco Robinson and Jessie Lewis, inside Brown's Barbecue restaurant in Memphis, Tennessee on March 11, 2003. Mr. Robinson died from his wounds. This Court summarized the underlying facts on the initial direct appeal as follows:

Toya Sanders testified that she and Robinson were childhood friends. She recalled that she saw Robinson at a club, the Hard Luck Café, on the night of March 11, 2003, and that everyone there was "[h]aving a good time." She admitted that she had smoked some marijuana that night but said that she did not drink. She stated that the [D]efendant, whom she had known since childhood as "Puff," was also at the club that night. She saw the [D]efendant and another male, whom she later learned through the course of the investigation was Eddie Partee, leaving the club in a Cadillac. After leaving the club at approximately 3:00 a.m., Sanders and her friends decided to go to Brown's Barbecue to get something to eat. When they arrived at Brown's Barbecue, the [D]efendant and Partee were already at the restaurant. Soon after she and her friends arrived, Robinson arrived at the restaurant.

Sanders testified that the [D]efendant went out to his car while Partee waited in line for his order. She recalled that Robinson and Partee exchanged words about Robinson's order while waiting in line. Robinson went outside to his car and Partee followed him but went to the [D]efendant's vehicle where Sanders witnessed Partee and the [D]efendant talking. When Robinson returned to the restaurant, Partee and the [D]efendant followed him. While the [D]efendant went to the bathroom, Partee pulled a gun and shot Robinson in the back of the head. As soon as Partee shot Robinson, the [D]efendant came out of the bathroom shooting "a little old bitty gun." Everyone fled the restaurant for safety. Sanders saw Partee and the [D]efendant leave the restaurant, get into the Cadillac and flee the scene.

Sanders testified that as everyone was leaving the restaurant, Jessie Lewis was walking in. She said that Partee and the [D]efendant shot Lewis as he was entering the restaurant. She stated that as the men returned, she "was trying to get everybody out" because she could tell that something was about to happen when the men went outside to the parking lot. Sanders testified that she never saw Robinson threaten or display a weapon to either the [D]efendant or Partee, but she also admitted that she could not see

whether Robinson retrieved anything from his car while he was outside listening to music with his hood up.

Jessie Lewis testified that he spoke with Robinson at Brown's Barbecue on the night of March 11, 2003. He recalled Robinson telling him that "something was wrong with [Partee]." Before Robinson could explain to Lewis what he meant, Partee entered the restaurant and shot him. Lewis had turned his back to Robinson but upon hearing the shot, he turned around and saw Partee standing over Robinson holding the gun. Lewis stated that the [D]efendant walked from the bathroom and fired two more shots toward Robinson as he lay on the ground. Lewis recalled that everyone except him had left the restaurant with the firing of the first shot. He said that he was standing at the door "so shocked, [he] couldn't go nowhere [sic]" when the [D]efendant came from the bathroom. The [D]efendant and Partee walked to the front door and saw Lewis. The [D]efendant then "bumped Partee in the back," and Partee "looked at [Lewis] and kicked the door open and shot [him]." Lewis was shot in the groin with the bullet exiting through his hip. He saw the [D]efendant and Partee leave in the Cadillac with Partee driving. Lewis later identified the [D]efendant as one of the individuals involved in the shooting. Lewis also stated that he did not see Robinson with a gun.

Kevia Taylor testified that she was with her cousin, Toya Sanders, at Brown's Barbecue on March 11, 2003. Her testimony was consistent with Sanders' testimony regarding the events leading up to the shooting. She witnessed Partee go to a vehicle, retrieve a pistol and load it before returning to the restaurant. She recalled that the [D]efendant looked at Partee as they returned to the restaurant and she took that as a signal between the two men. Taylor stated that she "knew something was fixing to go down" so she started to leave the restaurant. As she was leaving, she heard the gunshots. She ran behind a building and did not see the [D]efendant or Partee leave. Afterwards, she saw that Lewis had been shot as well as Robinson. Taylor later identified the [D]efendant from a photographic lineup. Taylor admitted that she saw Robinson open the hood of his car and go to his trunk, but she could not see whether he got anything from the trunk before returning to the restaurant.

Memphis Police Department Officer Kimberly Houston testified that she responded to the scene of the shooting at Brown's Barbecue on March 11, 2003. When she arrived, she observed a black male on the floor

˘3˘

suffering from a gunshot wound to the head and another black male sitting on a bench who had been shot in the leg. The man with the wound to the head was alive and conscious. She recalled that he was mumbling as if attempting to say something but that she could not understand him. She tried to calm him and tell him to stop talking; as she heard the ambulance approach, she looked to discover that he was no longer breathing. When the paramedics arrived, the man with the wound to his leg was treated and taken to the hospital by ambulance. Officer Houston stayed at the scene until the deceased victim was removed. Officer Houston also testified that she secured witnesses at the scene until more officers arrived to get information and statements from them.

Memphis Police Department Lieutenant Daniel Parris testified that he was assigned to the crime scene unit at the time of the offenses. He related that his general duties consisted of documenting the facts and physical evidence of a crime scene through photographs, sketches, and recovered evidence. Lieutenant Parris sketched the crime scene at Brown's Barbecue. He documented eight items at the scene, including blood, a spent bullet, bullet holes and strikes, and two forty caliber shell casings.

Kcbena Cash of the Memphis Police Department testified that the [D]efendant was developed as a suspect in the shootings within a week of the incident. After a warrant was issued for the [D]efendant's arrest, Officer Cash began to look for the [D]efendant. After Officer Cash talked to several family members and acquaintances of the [D]efendant, the [D]efendant telephoned Officer Cash himself. She explained to the [D]efendant that there was a warrant issued for him and asked him to come in voluntarily. She recalled that the [D]efendant did not agree to turn himself in. As she continued her efforts to locate the [D]efendant, she spoke with the [D]efendant daily on the telephone. She recalled that he always contacted her on private numbers. She testified that each time they talked "[t]he gist of the conversation was to turn himself in." Eventually, Officer Cash received a phone call or "tip" that led her to a possible location of the [D]efendant. Upon arrival at the residence, the [D]efendant was gone but a forty caliber handgun was discovered and taken into property at the Memphis Police Department. Eventually, Officer Cash received another tip regarding the [D]efendant's whereabouts at a different residence and he was apprehended there while trying to escape from a window. Additionally, another handgun and forty caliber ammunition were found at the residence. On cross-examination, Officer Cash admitted that the

[D]efendant was not found at the first residence searched and that no one knew who left the forty caliber handgun at the residence.

Sergeant William D. Merritt of the Memphis Police Department testified that he acted as the case coordinator on the [D]efendant's case. As part of his duties as the case coordinator, he sent items to the Tennessee Bureau of Investigation (TBI) for testing. Sergeant Merritt sent a Keltec forty caliber handgun, two forty caliber shell casings, one bullet projectile, and a Ruger nine millimeter semi-automatic to the TBI for analysis. Sergeant Merritt testified that the Ruger was recovered near a dumpster outside the restaurant. He further stated that his investigation revealed that Mario Broadnax had taken the Ruger from the victim and placed it near the dumpster.

TBI Special Agent Steve Scott testified as a firearms identification expert. After identifying the items submitted by Sergeant Merritt, Special Agent Scott determined that the spent cartridges and bullet recovered at the scene had been fired by the Keltec handgun. Testing of the Ruger pistol revealed that it would eject a shell casing much like the Keltec; however, no shell casings matching the Ruger were discovered at the scene. Special Agent Scott stated that the forty caliber bullet recovered from the victim's body was fired from a revolver-either a Smith and Wesson Special Revolver or a Remington Magnum Revolver-and not a semi-automatic pistol like the Keltec or Ruger. The gun that fired the bullet recovered from the victim was not presented to the TBI for testing.

Dr. O'Brian Smith testified that he was the Shelby County Medical Examiner at the time of the shooting and that he performed the autopsy on the victim and determined that he suffered a gunshot wound to the right side of his head behind his ear that produced brain damage before the bullet came to rest in the front portion of the victim's brain. Toxicology testing of the victim's blood revealed a .203 grams percent blood alcohol content which Dr. Smith characterized as "moderately elevated." Toxicology testing revealed no presence of drugs. Dr. Smith testified that the cause of death was a gunshot wound to the head and opined that "in most instances, this bullet . . . wound would have a lethal outcome."

The State presented the prior sworn testimony of Mario Broadnax which was read to the jury by a court reporter. . . . Broadnax testified that he had been at the Hard Luck Café on the night of the incident and that he

had not been drinking that night, although he did admit to smoking one or two marijuana cigarettes earlier in the evening. He went to Brown's Barbecue after leaving the club and recalled seeing the victim there when he arrived. He could tell that the victim and some other men were arguing and he saw "one or two people" go inside the restaurant with guns. Broadnax testified that when he heard gunshots he ran to the back of the building. When he returned to the front of the parking lot, he discovered the surviving victim, Jessie Lewis, lying on the ground with a gunshot wound. He ran inside to check on the other victim, Mareco Robinson, who was still breathing. He told the employees to call the police.

Broadnax stated that another witness indicated to him that the victim had a weapon so he returned to the victim, removed the gun from the victim's belt, and hid it behind the restaurant. Other witnesses told the police that Broadnax removed the gun so, several days later, he led the police to the location of the gun. He explained that he removed the gun because he "felt that if [the police] came and found a gun on [the victim], you know, that they probably wouldn't, you know, try to find out who did it." Broadnax identified the [D]efendant as one of the people he saw at the restaurant that night. He also stated that he removed the gun from underneath the victim's shirt. He admitted on cross-examination that he could not see who fired the shots because he ran behind the building when the shooting began. After the reading of Broadnax's testimony, the State rested its case-in-chief.

The [D]efendant presented the testimony of Daryl Powell, who stated that he was at Brown's Barbecue on the night of the shooting. He recalled that he was there sleeping but that he "wasn't supposed to be" there. He said that he was asleep in a booth when the argument between the victim and the other men woke him up. He said that he knew the victim by his neighborhood nickname of "C-Murder." He saw the victim go to his car and return to the restaurant with a black gun in his hand. He testified that everyone in the restaurant "just went hysterical" and the shooting began. He did not know the man who shot the victim. He reiterated that he saw a gun in the victim's hand when the shooting occurred. He testified that when one person shot the victim he just dropped and then another individual began shooting as well. He saw the two shooters leave the scene in a Cadillac. On cross-examination, Powell was confronted with his statement to police that failed to mention the presence of the victim's gun. He explained that maybe the police did not write that down and that he did

not want "to be in everybody else's business" but that he definitely saw the victim with a gun.

Calandra Shaw testified that she was working at Brown's Barbecue on the night of the shooting. She had worked at the restaurant for about fifteen years and knew the victim, "Reco," as a regular customer. She recalled that Reco and another man argued at the front counter for about ten minutes. She recalled that the other man left the restaurant and, about ten minutes later, she heard shooting. Shaw testified that she crawled to lock the door so no one else would come inside during the shooting. She stated that she heard a quick series of gunshots. When the shooting ended, she stood up to see the victim fall to the floor. She saw a man in a yellow shirt remove a gun from the victim's pocket. On cross-examination, she stated that she did not see the victim get shot, but she did see him fall to the ground after being shot.

Memphis Police Department Officer Danny James testified that he worked as a crime scene officer at the time of the shooting. He stated that he photographed the location of a gun found on the steps outside the restaurant.

*State v. Stanley Blue*, No. W2007-00292-CCA-R3-CD, 2009 WL 723845, at *1-5 (Tenn. Crim. App. Mar. 19, 2009), *perm. app. denied* (Tenn. Oct. 5, 2009). Based upon this evidence, a Shelby Count jury convicted the Defendant of facilitation of premeditated first degree murder, attempted second degree murder, and reckless endangerment. *Id.* at *1. The trial court imposed sentences of thirty-four years, fifteen years and six years, respectively; the trial court also ordered the thirty-four-year sentence to be served consecutively to the six-year sentence for a total effective sentence of forty years. *Id.* The Defendant appealed, and the trial court's judgments were affirmed. *Id.* at *10.

## B. Post-Conviction and Resentencing

Thereafter, the Defendant filed a petition for post-conviction relief, in which he alleged that his sentence was illegal. The post-conviction court agreed, and it remanded the case for a new sentencing hearing. This Court affirmed the post-conviction court's decision on appeal by the State. *Stanley Blue v. State*, No. W2011-01936-CCA-R3-PC, 2012 WL 3362270, at *1 (Tenn. Crim. App. Aug. 15, 2012). At the new sentencing hearing, the trial court determined that the Defendant's sentencing range for attempted second degree murder, which it classified as a Class A felony, was forty to sixty years. The trial court sentenced the Defendant to forty years for facilitation of first degree

premeditated murder and to forty years for attempted second degree murder and ordered that the sentences run concurrently. The trial court also determined that the Defendant's sentencing range was four to six years as a Range III persistent offender for reckless endangerment, a Class E felony, and it imposed a consecutive six-year sentence for the reckless endangerment conviction, for a total effective sentence of forty-six years. *Blue*, 2014 WL 1464177, at *6. On appeal, this Court concluded that the trial court had improperly classified the attempted second degree murder conviction as a Class A felony. *Id.* at *7. This Court also concluded that the trial court erred when it determined that the Defendant was a Range III persistent offender for the purposes of his reckless endangerment conviction. *Id.* at *7-8. We reversed the judgments and remanded the case to the trial court for a new sentencing hearing on the attempted second degree murder and reckless endangerment convictions. *Id.* at *8. We affirmed the trial court's imposition of partial consecutive sentencing. *Id.* at *9.

After remand, the second resentencing hearing was held on August 22, 2014, during which the presentence report was admitted into the record. As to the attempted second degree murder conviction, the trial court found that the Defendant was a Range III persistent offender. The trial court considered the following enhancement factors: (1) that the Defendant had a previous history of criminal convictions; (2) that the Defendant employed a firearm during the commission of the attempted murder; and (3) that the Defendant committed delinquent acts as a juvenile that would have constituted felonies if committed as an adult. *See* T.C.A. c 40-35-114(1), (9), and (16) (2014). The trial court stated that it was taking into account the applicable mitigating factors, including the Defendant's "mental status." The trial court went on to state that the offenses were "very aggravated" and that the Defendant exhibited a "total lack of consideration [for] the well-being" of the people involved. The trial court found that "confinement [was] necessary to avoid deprecating how serious this offense was." On that basis, the trial court sentenced the Defendant for his attempted second degree murder conviction to thirty years as a Range III persistent offender. The trial court stated that this sentence would run concurrently with the Defendant's four-year sentence for facilitation of first degree premeditated murder.

As to the Defendant's reckless endangerment conviction, the trial court noted that, by agreement between the State and the Defendant, the Defendant would be sentenced as a Range II multiple offender. The trial court found that the Defendant had a previous history of criminal convictions necessary to establish sentencing Range II, and imposed a sentence of four years. As to consecutive sentencing, the trial court made the following finding:

> [T]he Court finds that [the Defendant] is an offender whose record

of criminal activity is extensive. I further find that he is a dangerous offender whose behavior indicates little or no regard to human life, that he had no hesitation about committing this offense in which the risk to human life was high, that the circumstances surrounding the commission of this offense were extremely aggravated, the danger that he placed everybody in inside that restaurant is extremely aggravated, that confinement for an extended period of time is necessary to protect society from [the Defendant] and his unwillingness to lead a productive life and his resort to criminal activity in furtherance of that anti societal lifestyle, and finally, that the aggregate length of the sentence reasonably related to the offense for which the [D]efendant stands convicted. A man was killed, another man seriously injured, many people were endangered.

With the extensive record that [the Defendant] has, the Court feels that it's appropriate that those sentences should be served consecutive[ly]. So I will order that count three, the reckless endangerment with a deadly weapon, should be served consecutive to count one, that facilitation to commit [first degree premeditated] murder.

The trial court imposed a total effective sentence of forty-four years. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant asserts the trial court erred when it imposed consecutive sentences. He contends that the trial court failed to apply the principles of sentencing and failed to consider the shorter sentence that the Defendant's co-defendant received. The State responds that, in the prior appeal of the Defendant's sentence, this Court approved the imposition of consecutive sentencing and thus, the law of the case disposes of the Defendant's claim. The State argues in the alternative that the trial court did not abuse its discretion when it imposed partial consecutive sentencing.

Under the law of the case doctrine, a court generally may not reconsider issues that have been decided in a prior appeal of the same case. *State v. Jefferson*, 31 S.W.3d 558, 560-61 (Tenn. 2000). The doctrine is most often invoked when a trial court encounters a previously litigated issue in the course of carrying out an appellate court's instructions upon remand. The rule is "based on the common sense recognition that issues previously litigated and decided by a court of competent jurisdiction ordinarily need not be revisited." *Memphis Publ'g Co. v. Tenn. Petroleum Underground Storage Tank Bd.*, 975 S.W.2d 303, 306 (Tenn.

1998).  The rule "promotes the finality and efficiency of the judicial process, avoids indefinite relitigation of the same issue, fosters consistent results in the same litigation, and assures the obedience of lower courts to the decisions of appellate courts."  *Id.*

We agree that this issue of partial consecutive sentencing was argued and decided on appeal in a prior opinion of this Court when we concluded that "the trial court's imposition of partial consecutive sentences is supported by the record."  *Blue*, 2014 WL 1464177, at *9.  The Defendant's sentence, however, was changed during resentencing, and the trial court readdressed the issue of whether consecutive sentencing was appropriate.  Therefore, while the State's argument is well taken, we will address the issue of consecutive sentencing on its merits in this appeal.

Under the Tennessee Criminal Sentencing Reform Act of 1989 and its amendments, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles.  T.C.A. § 40-35-210(c)(2), (d) (2010); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008).

In *State v. Bise*, the Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'"  380 S.W.3d 682, 708 (Tenn. 2012).  A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'"  *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).  To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision.  *Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001); *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980).  The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute."  *Bise,* 380 S.W.3d at 709-10.  In other words, so long as the trial court sentences a defendant within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness.  *Id.* at 707.

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order sentences to run consecutively if it finds any one of the statutory criteria by a preponderance of the evidence.  *See also State v. Wilkerson*, 905 S.W.2d 933, 936 (Tenn. 1995).  As it relates to this case, the trial court found the following criteria applicable:

(2) The defendant is an offender whose record of criminal activity is extensive;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

T.C.A. § 40-35-115(2) and (4). These criteria are stated in the alternative; therefore, only one need exist to support the imposition of consecutive sentencing. *See id.*; *State v. Denise Dianne Brannigan*, No. E2011-00098-CCA-R3-CD, 2012 WL 2131111, at *19 (Tenn. Crim. App., at Knoxville, June 13, 2012), *no Tenn. R. App. P. 11 application filed*. The imposition of consecutive sentencing, however, is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed [.]" *Wilkerson*, 905 S.W.2d at 939; T.C.A. § 40-35-103(2), (4). We review a trial court's decision to impose consecutive sentences for an abuse of discretion with a presumption of reasonableness. *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013).

Our review of the record reflects that the trial court specifically addressed the required sentencing factors and principles as required by *Wilkerson*. The facts contained in the record show that the Defendant brandished a weapon inside a crowded public restaurant, causing the patrons to flee in fear. He then fired at and shot two men, killing one of them, which supports the conclusion that the sentence imposed was necessary to protect the public and reasonably relates to the severity of the offense. *See State v. Wilkerson*, 905 S.W.2d 933, 938-39 (Tenn. 1995). Moreover, the trial court properly applied consecutive sentencing criteria (2) and (4). The record supports that, respectively, the Defendant had an extensive record of criminal activity and that the Defendant's behavior showed little regard for human life. Accordingly, we conclude that the record demonstrates that consecutive sentencing was appropriate in this case and that the trial court did not abuse its discretion when it imposed consecutive sentences. The Defendant is not entitled to relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE